UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES BUSCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| COUNTY OF ERIE, | ) |
| GRACE MOKA, RN, | ) |
| JESSICA HALL, NP, | ) Case No. 1:20-cv-01515 |
| MIKE MCBRIDE, LPN, | ) |
| JULIA DIBIASE-JOHNSTON, RN, | ) |
| LYDIA TORRES, RN, | ) |
| ALLISON PARKER, | ) |
| HEIDI CORNELL, NP, | ) |
| DEBRA WESTFIELD, RN, | ) |
| JOHN DOES 1-10, | ) |
| SHC SERVICES, INC., and | ) |
| JOHN DOES 1-10, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**
(Doc. 49)

Plaintiff James Busch brings this suit against Defendants County of Erie; Grace Moka, RN; Jessica Hall, NP; Mike McBride, LPN; Julia DiBiase-Johnston, RN; Lydia Torres, RN; Allison Parker; Heidi Cornell, NP; Debra Westfield, RN; John Does 1-10, intended to be the individuals/officers responsible for supervising the Plaintiff; SHC Services, Inc.; and John Does 1-10, intended to be the individuals/medical professionals responsible for providing medical care to Plaintiff while he was incarcerated.

Plaintiff's claims arise from his contraction of Hepatitis A while at the Erie County Holding Center and the Erie County Correctional Facility ("ECCF"). In his Amended Complaint, Plaintiff alleges negligence (Count I); violations of 42 U.S.C. § 1983 (Count II); and conspiracy to deprive him of his civil rights (Count III).

In a May 6, 2022 Opinion and Order, the court granted in part and denied in part Defendants' motion for judgment on the pleadings and dismissed Plaintiff's *Monell* claims against the County of Erie. (Doc. 30.) On April 13, 2023, the court entered the parties' stipulation of dismissal as to SHC Services, Inc. (Doc. 41.)

Pending before the court is Defendants' motion for summary judgment filed on January 8, 2024. (Doc. 49.) Plaintiff opposed the motion on February 1, 2024. (Doc. 53.) Defendants replied on February 14, 2024, at which time the court took the pending motion under advisement. (Doc. 55.)

Plaintiff is represented by Blake Joseph Zaccagnino, Esq. Defendants are represented by Anthony B. Targia, Esq., and Eric Warren Marriott, Esq.

## I.   Whether to Consider the Defendants' Statement of Material Facts.

Plaintiff asks the court to deny Defendants' motion for failure to submit a statement of material facts as required by Western District of New York Local Rule ("W.D.N.Y. Loc. R.") 56(a)(1). Defendants concede this failure but cite the statement of facts included within their motion's declaration and a statement of material facts submitted with their reply as a remedy negating the need for dismissal on this basis.

Pursuant to W.D.N.Y. Loc. R. 56, a party moving for summary judgment must file "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried[,]" including "citation to admissible evidence or to evidence that can be presented in admissible form at trial[.]" Loc. R. Civ. P. 56(a)(1) (emphasis omitted). "Failure to submit a statement in compliance with this Rule may constitute grounds for denial of the motion." *Id.*

The opposing statement "shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs[.]" Loc. R. Civ. P. 56(a)(2). "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." *Id.* The non-moving party may also include "additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine

2

issue to be tried." *Id.* (emphasis omitted).

In support of their motion, Defendants provide a "factual history" section in their attorney's declaration that enumerates factual statements with citations to supporting evidence. *See* Doc. 49-1 at 4-10. Plaintiff neither disputed these facts nor moved to strike them but rather submitted his own statement of undisputed facts. (Doc. 54.) Thereafter, Defendants submitted a statement of material facts and a response to Plaintiff's statement of undisputed facts. (Doc. 55-1.) In such circumstances where both parties have had an opportunity to identify undisputed and disputed facts, Defendants' failure to file a separate statement is not sufficiently egregious to warrant dismissal of their motion. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129 (2d Cir. 2011) (affirming the Second Circuit's "strong preference for resolving disputes on the merits") (citation and internal quotation marks omitted).

The Western District of New York Local Rules contemplate the non-moving party to submit a response and additional material facts concerning "a genuine issue to be tried." Loc. R. Civ. P. 56(a)(2). Plaintiff's statement, sworn to by his attorney, includes several facts without record citations, *see* Doc. 54 at 6, 9 ¶¶ 19, 27, as well as excerpts from an expert witness's opinion. *See id.* at 5, ¶ 17. The court considers Plaintiff's statement to the extent it is supported by admissible evidence and disregards it to the extent it is not. *See* Fed. R. Civ. P. 56(c)(1) (stating that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" with citations to the record); *Picard v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022) ("Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.") (alteration adopted) (citation and internal quotation marks omitted).

For the reasons stated above, Plaintiff's request to deny summary judgment based on non-compliance with W.D.N.Y. Loc. R. 56(a)(1) is DENIED.

## II.   Undisputed Facts.

On August 8, 2019, Plaintiff was taken into custody and housed at the Erie County

Holding Center before transfer to ECCF on August 17, 2019. When he entered these facilities as a pretrial detainee, he did not have Hepatitis A. According to an October 8, 2019 press release from the Erie County Department of Health, symptoms of Hepatitis A include fatigue, abdominal pain, fever, dark urine, pale stools, and yellowing of the skin and eyes. Defendants were aware of these symptoms.

On October 15, 2019, Plaintiff reported "fatigue and generalized body ache" during a visit with Grace Moka, RN, and reported being "poisoned" possibly from peanut butter. (Doc. 49-4 at 2) (internal quotation marks omitted). He stated that he was "freezing, yet warm to the touch" and denied "GI or respiratory symptoms." *Id.* at 2, 4. Defendant Moka prescribed Tylenol and advised Plaintiff to increase his fluid intake.

The next day, Plaintiff saw David Julien, FNP, for a knee injury follow-up appointment. Mr. Julien cleared Plaintiff for work and noted that Plaintiff was "alert and oriented[,]" had "a pleasant disposition[,]" was not in pain or distress, and was afebrile. *Id.* at 8. Plaintiff's Naproxen prescription was thereafter renewed.

On October 18, 2019, Plaintiff reported cold symptoms and completed a request for a medical visit (a "sick call slip"). The following day, he was seen by Julie DiBiase-Johnston, RN, and complained of "fever and having an infection . . . [and] feels like he was poisoned." *Id.* at 9. Defendant DiBiase-Johnston reported that Plaintiff denied having a sore throat, respiratory distress, or a cough but stated that his urine was dark and stringy, his mucous membrane and lips were dry, and he had poor turgor. Plaintiff stated that he drinks two cups of water per day. Defendant DiBiase-Johnston advised him to increase his fluid intake and follow up with medical providers if his symptoms persisted or worsened.

After Plaintiff submitted a sick call slip on October 21, 2019, reporting multiple complaints, he was seen by Allison Parker later that same day. She wrote that he complained of "ongoing malaise, dark urine, body aches, [and soft,] pale stool[,]" *id.* at 13, he denied respiratory concerns, and he did not present with a fever. He stated he "feels he has an intestinal parasite[,]" reported "unprotected sex while in community[,]" and claimed that he intentionally did not report his symptoms to Mr. Julien because he

4

desired a work clearance. *Id.* at 15. After the appointment, Heidi Cornell, NP, ordered blood tests and a urinalysis.

Thereafter, during an appointment with Defendant Cornell, Plaintiff stated that he was experiencing fatigue, body aches, decreased appetite, a fever, abdominal pain, discolored urine, and pale stools. He reiterated his belief that he had a parasite and denied alcohol usage or a history of hepatitis. She advised that she would follow up with him "once labs have been rec[ei]ved and reviewed." (Doc. 49-4 at 19.)

On October 23, 2019, providers reviewed Plaintiff's laboratory results, which revealed a normal complete blood count, negative STD and HIV results, and a negative thyroid panel but increased bilirubin, alkaline phosphate, AST, and ALT in his comprehensive metabolic panel. Debra Westfield, RN, completed an "offsite consult form" which explained the reason for referral to Erie County Medical Center ("ECMC") as "evaluation and treatment abdominal pain, fatig[u]e, decreased appe[tite], i[]cteric urine and fever[.]" *Id.* at 24. Plaintiff was transported to ECMC that day.

Upon his arrival at ECMC on October 23, 2019, Plaintiff complained of jaundice, abdominal pain, and poor appetite. He was diagnosed with Hepatitis A. In the evening of October 24, 2019, an ECMC provider noted that Plaintiff "request[ed] discharge" and wrote "[p]atient medically cleared and stable for discharge back to facility." (Doc. 49-5 at 35.)

On October 31, 2019, Plaintiff was discharged from ECMC, and correctional facility medical staff thereafter monitored his liver with routine blood work. The Erie County Department of Health also conducted contact tracing and determined that no other inmate in the ECCF men's unit contracted Hepatitis A at the same time as Plaintiff. Plaintiff testified at a 50-H hearing that he requested a work clearance for the kitchen after he returned to ECCF, "at the end of [the] monitoring [of] [his] liver levels[,]" and felt he was "[a]bsolutely[]" able to perform the job. (Doc. 49-2 at 45.)

Defendants assert that Plaintiff contracted Hepatitis A through consuming unpasteurized wine, citing an ECMC medical record in which he reported to a medical treatment provider that he "occasionally consumes 'unpasteurized wine' which is

5

surreptitiously made in the facility[,]" and the ECMC provider's statement on October 24, 2019, that Plaintiff's illness was "[l]ikely transmitted via poor preparation of present wine versus poor preparation of food[.]" (Doc. 49-5 at 27, 31.) In a 50-H hearing, Plaintiff testified that he recalled his statement to the ECMC provider, admitted he has obtained unpasteurized wine on one occasion from another inmate, and explained that it is made by placing the juice and sugar inmates receive into a bowl until the mixture ferments into wine. (Doc. 49-2 at 60-62.) He claimed to have heard of the term "hooch[]" but not "toilet wine[.]" *Id.* at 62.

In his deposition, Plaintiff denied that he had ever consumed alcohol made at a holding center.[1] Plaintiff references an October 24, 2019 ECMC medical record stating that his Hepatitis A was "[l]ikely transmitted via poor preparation of food[,]" (Doc. 49-5 at 35), and an internal email from an Erie County employee who restated an Erie County epidemiologist's, Mary Walawander's, opinion that Plaintiff "most likely contracted Hep[atitis] A inside facility at [the holding center]. (8/26-9/30)[.]" (Doc. 53-15 at 29.)[2]

Mary Walawander-Lanning, an epidemiologist from whom Defendants submitted an affidavit, averred that Hepatitis A is contracted through sexual contact, ingesting the virus from food or drinks, or contact with objects contaminated with fecal matter. She explained that unpasteurized wine is "known to be hidden inside of toilets" and Plaintiff's consumption of it was a potential source of his infection. (Doc. 49-16 at 2, ¶ 5.) Alcohol is contraband at ECCF, and promoting prison contraband at the facility is a Class D felony. Mike McBride, LPN, testified that he had observed ECCF inmates using their toilet as a refrigerator during the summer. There is no evidence that Plaintiff had contact with another inmate who had Hepatitis A or that the food at the facility was determined to

---

[1] Plaintiff does not dispute he made a contrary statement to an ECMC provider on October 24, 2019. *See* Fed. R. Evid. 803(4) (explaining that a "statement that: (A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause[]" is not excluded by the hearsay rule even if the declarant is available as a witness).

[2] It is undisputed that Plaintiff contracted Hepatitis A within the facility. How he contracted it, whether by self-inflicted injury or by some other means not yet established, is contested.

be a cause of Plaintiff's Hepatitis A.

## III. Disputed Facts.

Defendants dispute the presence of anyone with Hepatitis A at Erie County Holding Center or ECCF in October 2019. They note that Plaintiff does not distinguish between the two facilities at which he was incarcerated at different times and assert that he does not demonstrate that he had contact with anyone in Erie County with Hepatitis A. They state Plaintiff's evidence reveals one female inmate who contracted Hepatitis A one month before Plaintiff became symptomatic; however, Erie County Holding Center and ECCF house genders separately, and there is no evidence Plaintiff had contact with this female inmate.

Plaintiff claims that at least four inmates were diagnosed with Hepatitis A in April and September 2019.[3] He does not claim any contact with these inmates.

Tim Kane, RN, LNC, an expert for Plaintiff, opined that the ECMC providers "did not use the [Centers for Disease Control and Prevention ("CDC")] recommended guideline of prisons keeping a watch for 102 days" after a Hepatitis A exposure. (Doc. 53-18 at 7, ¶ 18.) Mr. Kane stated that the "nursing staff and medical staff violated a ECSO policy on assessments of inmates[,]" because nurses did not "obtain a complete set of vital signs for all symptomatic assessments and assessment of the complaint." *Id.* at ¶ 20. Mr. Kane claims that if Defendants had abided by CDC and ECSO policies, Plaintiff would have been diagnosed and isolated sooner. Defendants contest this opinion by challenging it as a claim of medical malpractice insufficient to rise to the level of a constitutional violation.

---

[3] Plaintiff's evidence appears to document one male inmate diagnosed with Hepatitis A on April 7, 2019, *see* Doc. 53-15 at 39, 60, one female inmate who tested positive on September 16, 2019, and one additional confirmed infected female on September 20, 2019. *Id.* at 10, 70. Citing news articles and press releases, Plaintiff notes that there were Hepatitis A cases in the community. *See* Doc. 53-16. He also claims that there was an "outbreak" at Erie County Holding Center and ECCF but makes this assertion "upon information and belief[.]" Doc. 53 at 2, ¶ 7; *see Dellacava v. Painters Pension Fund of Westchester & Putnam Cntys.*, 851 F.2d 22, 26 (2d Cir. 1988) (rejecting statement based "upon information and belief" as admissible evidence for purposes of summary judgment) (citation and internal quotation marks omitted).

7

With regard to Plaintiff's hospitalization, Defendants assert that he requested and was cleared for discharge on October 24, 2019, but the Erie County Department of Health recommended Plaintiff remain hospitalized for an additional week to prevent Hepatitis A transmission. Plaintiff contends that he was not released until November 1, 2019, "[a]s a result of his condition[.]" (Doc. 53 at 2, ¶ 10.)

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the non-moving party[]" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (citations and internal quotation marks omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (alteration in original) (citation and internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to

8

establish the existence of [an] element at trial." *Id.* at 166-67 (alterations in original) (citation and internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d at 545 (citation, emphasis, and internal quotation marks omitted). In this case, although there are disputed issues of fact, none are material to a resolution of the issues for which Defendants seek summary judgment. *See Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

**B.   Whether to Grant Summary Judgment on Plaintiff's § 1983 Claim.**

　　**1.   Whether Plaintiff's § 1983 Claim Should Be Considered Under the Eighth or Fourteenth Amendment.**

To state a § 1983 claim under the Eighth Amendment's Cruel and Unusual Punishment Clause, a convicted prisoner must establish that the state was deliberately indifferent to his or her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In contrast, "[a] pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment,

9

rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). The rights of pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Plaintiff states that he "was a pretrial detainee at the time of his injuries" and "argues that [although] the evidence establishes his claim under both the Eighth and Fourteenth Amendments and that many issues of fact on both causes of action exist, . . . this case should be analyzed under the Fourteenth Amendment." (Doc. 53-1 at 6) (emphasis omitted). Defendants reference both Amendments when discussing Plaintiff's § 1983 failure to treat claim and acknowledge Plaintiff's pretrial status in their reply, noting that the Second Circuit has determined that the same objective test applies under both Amendments. *See Darnell*, 849 F.3d at 30 ("Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health[.]'") (citation and internal quotation marks omitted).

For the foregoing reasons, the court considers Plaintiff's § 1983 claim as one asserted by a pretrial detainee under the Due Process Clause of the Fourteenth Amendment.

### 2. Whether Defendants Violated the Due Process Clause of the Fourteenth Amendment.

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). As the Second Circuit observed in *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019):

> It is well established that when the state takes a person into custody, severely limiting his ability to care for himself, and then is deliberately indifferent to his medical needs, the . . . proscription against the unnecessary and wanton infliction of pain is violated. That is true whether the deliberate indifference is manifested by prison doctors in their response to the prisoner's needs, or by prison guards who intentionally deny or delay

10

access to medical care or intentionally deny or delay access to the treatment once prescribed.

*Id.* (citing *Estelle*, 429 U.S. at 104-05). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.

A "serious medical need" is one that requires urgent treatment and may result in "death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86. It may also arise where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain[.]'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). To assess seriousness, courts consider "whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles*, 925 F.3d at 86. The conditions "must be evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30 (citation and internal quotation marks omitted). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) (footnote omitted).

"A plaintiff can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety.'" *Charles*, 925 F.3d at 87 (alteration and emphasis in original) (quoting *Darnell*, 849 F.3d at 35). As a result, a delay in medical care may in certain cases establish deliberate indifference to medical needs, but "a prisoner's [constitutional] rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment[.]'" *Rodriguez v. Ames*, 224

11

F. Supp. 2d 555, 561 (W.D.N.Y. 2002) (quoting *Rodriguez v. Mercado*, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002)).

Defendants contend that Plaintiff received reasonable care and there is no evidence of deliberate indifference to a substantial risk of harm. Plaintiff counters that Defendants understood that Hepatitis A is a serious medical condition requiring urgent treatment to prevent harm, were aware of prior Hepatitis A cases, and knew or should have known that his symptoms were indicative of Hepatitis A. He claims his delayed diagnosis, unnecessary pain and suffering, and lengthy hospitalization could have been avoided.

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. . . . Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance*, 143 F.3d at 703 (citations omitted). However, "certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (citation and internal quotation marks omitted). "In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.* (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.*

On October 15, 2019, Plaintiff first reported symptoms of fatigue and body aches. He was seen by a medical professional on that day. The next day, he presented with no fever, a good disposition, and intentionally did not report his symptoms to Mr. Julien. On October 18, 2019, he reported cold symptoms on a sick call slip, and on October 19, 2019, Defendant DiBiase-Johnston recorded symptoms consisting of dark and stringy urine, dry mucous membranes and lips, and poor turgor. She advised Plaintiff to increase his fluid intake and follow up if his symptoms worsened. On October 21, 2019, Plaintiff visited Defendant Parker, who noted Plaintiff reported dark urine, pale and soft stools,

malaise, body aches, although he did not have a fever. That same day, Defendant Cornell ordered laboratory testing.

Thereafter, Plaintiff reported continued symptoms to Defendant Cornell. After Plaintiff's laboratory results were received on October 23, 2019, he was transported to ECMC for hospitalization on that same day.

Because Plaintiff falsely reported he had recovered from his symptoms on October 16, 2019, and then sought medical treatment on October 18, 2019, for cold symptoms, any delay in treatment was from October 18 to October 23 when he was transported to the hospital. During that time period, he was seen three times by medical professionals and laboratory tests were ordered, reviewed, and acted upon the same day as their receipt. It is against this backdrop that the court evaluates Plaintiff's Fourteenth Amendment claim.

### a.     Whether Plaintiff Establishes Personal Involvement.

As a threshold issue, in order to survive summary judgment, "[a] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). The Second Circuit has held that "personal involvement" under § 1983 means "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

Plaintiff adduces no evidence that Defendants Hall, McBride, Torres, or Westfield treated him during the relevant period. His § 1983 claims against these Defendants therefore must be DISMISSED. *See Hicks v. City of Buffalo*, 124 F. App'x 20, 23-24 (2d Cir. 2004) (summary order) ("[Defendant] had no personal involvement in any of the events . . . [t]herefore, he cannot be liable for any aspect of the § 1983 claim that arises therefrom.").

13

### b. Whether Plaintiff Proffers Admissible Evidence of Deliberative Indifference.

Plaintiff has addressed some evidence of personal involvement by Defendants Cornell, DiBiase-Johnston, Moka, and Parker. Hepatitis A is a serious medical condition, and Defendant DiBiase-Johnston affirmed the urgent need for a higher level of care for a symptomatic Hepatitis A patient. There is no evidence, however, that treatment providers, such as Defendants DiBiase-Johnston or Moka, knew that Plaintiff had Hepatitis A and disregarded the diagnosis. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth [or Fourteenth] Amendment." *Estelle*, 429 U.S. at 106. Plaintiff was seen each time he requested medical care by medical professionals who provided escalating treatment and immediately transferred him to the hospital after receiving his blood test results. *See Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

From the date of his reporting cold symptoms on October 15, 2019, until he was transported for hospitalization on October 23, 2019, there was a period of eight days. Plaintiff saw a medical professional on five of those days. He intentionally did not disclose his symptoms to one medical professional, thereby suggesting his symptoms had been resolved. He does not proffer evidence that he had contact with an inmate infected with Hepatitis A, nor does he establish that there was an outbreak of hepatitis due to food contamination. Instead, he reported to medical professionals that he felt he had been "poisoned" and had an "intestinal parasite[,]" and he admits that he reported he consumed unpasteurized wine that was provided by another inmate. (Doc. 49-4 at 2, 15.)

Although Plaintiff emphasizes the delay of hospitalization, "delay alone will not give rise to a constitutional claim unless the delay causes substantial harm[,]" and none is claimed here. *Evan v. Manos*, 336 F. Supp. 2d 255, 262 (W.D.N.Y. 2004). Plaintiff has not produced any evidence of substantial harm, he requested and was cleared for discharge the day after he was admitted, and stated he was "[a]bsolutely[]" able to

14

perform work assignments shortly after his release. (Doc. 49-2 at 45.)

Based on the undisputed facts, no rational jury could conclude that Defendants acted with deliberate indifference and deprived Plaintiff of medical care causing "substantial harm" to him in violation of the Due Process Clause of the Fourteenth Amendment.[4] Accordingly, the court GRANTS Defendants' motion for summary judgment on Plaintiff's § 1983 claim based on the alleged failure to treat.

### c. Whether Plaintiff Has Established a Conditions of Confinement Claim.

To the extent Plaintiff alleges a "conditions of confinement" claim, it also fails. "Conditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Darnell*, 849 F.3d at 30 (alteration adopted) (citation and internal quotation marks omitted). For example, "[u]nsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* Courts "analyze allegedly unconstitutional unsanitary conditions of confinement . . . with reference to their severity and duration, not the detainee's resulting injury." *Id.*

"[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996). Indeed, "[c]ourts

---

[4] *Compare Victor v. Milicevic*, 361 F. App'x 212, 214 (2d Cir. 2010) (summary order) (affirming summary judgment on deliberate indifference claims in favor of a doctor who had seen the plaintiff "on a number of occasions, and she stated that she had prescribed him medications, approved laboratory testing, and given orders restricting his physical activity"), *and Evan v. Manos*, 336 F. Supp. 2d 255, 261 (W.D.N.Y. 2004) (granting summary judgment on deliberate indifference claims for a provider who visited an inmate "nine days after [he] was placed on the doctor callout list[,]" prescribed pain medication, and ordered x-rays), *with Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994)) ("A jury could also infer deliberate indifference from the delay of over two years between the discovery of the broken pins [in a hip] and the time [the provider] asked that [the inmate] be re-evaluated for surgery[.]"), *and Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974) (concluding that "the allegations support the claim that it was deliberate indifference towards [plaintiff's] medical needs, rather than an exercise of professional judgment, which led prison medical officials merely to stitch the stump of his ear" instead of attempting to save the appendage).

15

have long recognized that conditions posing an elevated chance of exposure to an infectious disease can pose a substantial risk of serious harm[,]" but "[t]he Supreme Court has made clear that whether a particular danger poses a substantial risk of serious harm in a prison must be evaluated in light of the steps that the facility has already taken to mitigate the danger." *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y. 2020).

The parties agree that Plaintiff contracted Hepatitis A while at ECCF, but there is conflicting evidence regarding how he contracted it. Plaintiff points to no conditions of his confinement, no unsanitary conditions, or any deprivations of an "identifiable human need such as food, warmth, or exercise[]" which existed much less which had a causal relationship with his Hepatitis A. *Darnell*, 849 F.3d at 30 (citation and internal quotation marks omitted). If Plaintiff contracted Hepatitis A from drinking unpasteurized wine, he cannot recover for such a claim. *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("[A] plaintiff may not establish injury for standing purposes based on a 'self-inflicted' injury.").

Although Plaintiff claims that there was a Hepatitis A "outbreak" at Erie County Holding Center and ECCF, Plaintiff's evidence documents only two female inmates who contracted Hepatitis A during the relevant period who were housed separately from him. Plaintiff points to no facts that Defendants exposed him to a risk of contracting Hepatitis A and were deliberately indifferent to it.[5] Plaintiff has thus failed to sustain his burden to establish that his conditions of confinement gave rise to a Fourteenth Amendment violation. *See Celotex Corp.*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]").

---

[5] *See Narvaez v. City of New York*, 2017 WL 1535386, at *9 (S.D.N.Y. Apr. 17, 2017) ("Plaintiff fails to plead facts showing that any action or inaction on the part of Defendants caused him to contract Hepatitis A."); *Jones v. Goord*, 435 F. Supp. 2d 221, 246-47 (S.D.N.Y. 2006) ("[Plaintiff's] bare assertion that he contracted tuberculosis from a cellmate is insufficient to defeat a motion for summary judgment when the evidence in the record shows that none of his cellmates had active tuberculosis.").

For reasons stated above, Defendants' motion for summary judgment on Plaintiff's § 1983 claim based on conditions of confinement is GRANTED.

### C. Whether to Grant Summary Judgment on Plaintiff's Conspiracy Claim.

Defendants argue that the court should dismiss Plaintiff's conspiracy claim because it is barred by the intracorporate conspiracy doctrine and there is no evidence of an agreement between Defendants, concerted action to inflict injury, or action in furtherance of a conspiracy. Plaintiff "relies on the totality of the evidence" in opposition. (Doc. 53-1 at 33.)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "The intracorporate conspiracy doctrine 'bars conspiracy claims against employees of entities such as [the Department of Corrections] (when those employees are alleged to have conspired solely with each other) unless, pursuant to the doctrine's 'scope of employment' exception, the employees were pursuing personal interests wholly separate and apart from the entity by whom they were employed.'" *Richard v. Fischer*, 38 F. Supp. 3d 340, 353 (W.D.N.Y. 2014) (citations omitted). "Courts in the Western District of New York apply the intracorporate conspiracy doctrine to bar inmates' conspiracy claims against [the Department of Corrections]." *Id.* (collecting cases).

Because Plaintiff's Amended Complaint states a conspiracy claim against all Defendants for violation of his "civil rights" and deprivation of his "constitutional rights[,]" the court construes this as a § 1983 conspiracy claim. (Doc. 17 at 39.) Defendants are employees of the County of Erie, and Plaintiff has offered no factual evidence of an agreement to inflict an unconstitutional injury or evidence that each Defendant had an independent conspiratorial purpose. In the absence of admissible evidence to establish the three essential elements of a § 1983 conspiracy claim, that claim must fail. In addition, any conspiracy claim is barred by the intracorporate doctrine. The

17

court thus GRANTS Defendants' summary judgment motion on Plaintiff's conspiracy claim.

### D. Whether Plaintiff is Entitled to Punitive Damages.

Defendants request summary judgment on Plaintiff's punitive damages claim. "[P]unitive damages are intended 'to punish the tort-feasor for his [or her] conduct and to deter him [or her] and others like him [or her] from similar action in the future.'" *Racich v. Celotex Corp.*, 887 F.2d 393, 396 (2d Cir. 1989) (citing *Sharapata v. Town of Islip*, 437 N.E.2d 1104, 1105 (N.Y. 1982)). "To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another[.]" *Don Buchwald & Assocs., Inc. v. Rich*, 723 N.Y.S.2d 8, 9 (N.Y. App. Div. 2001); *see also Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) ("[P]unitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable conduct.'") (citing *Borkowski v. Borkowski*, 355 N.E.2d 287 (N.Y. 1976) (mem)).

Plaintiff cannot recover punitive damages against the County of Erie because it is a municipality. *See Krause v. Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352, 391 (W.D.N.Y. 2006) ("[P]unitive damages cannot be recovered from a municipal entity or municipal employees sued in their official capacity.") (citing *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir. 1997); *see also Corvetti v. Town of Lake Pleasant*, 46 N.Y.S.3d 679, 687 (N.Y. App. Div. 2017) ("[P]unitive damages are not available against a municipality[.]"). The court thus GRANTS summary judgment and DISMISSES Plaintiff's claim for punitive damages against the County of Erie to the extent that request is based on Plaintiff's federal constitutional claims.

### E. Whether to Exercise Supplemental Jurisdiction With Regard to Plaintiff's State Law Negligence Claims.

Defendants argue that the court should dismiss Plaintiff's negligent hiring, retention, supervision, and training claim because there is no evidence that the individual

18

Defendants had the propensity for injury-causing conduct prior to the relevant period. They claim they moved for summary judgment on all Plaintiff's claims, including any remaining negligence claims, and assert those claims must fail because Plaintiff did not plead the existence of a special duty.

Plaintiff contends Defendants' motion should be denied because they "did not move for summary judgment regarding [his] negligence claims not based on respondeat superior and not under [§ 1983.]" (Doc. 53-1 at 33) (emphasis omitted).[6]

Plaintiff's Amended Complaint contains a claim for negligence asserted against all Defendants, within which there are claims for negligent training, supervision, hiring, and retention asserted against County of Erie, SHC Services, Inc., and John Does 1-10. *See* Doc. 17. It does not assert a special duty. Defendants' motion for summary judgment asserts that it seeks judgment as a matter of law on all claims, *see* Doc. 49-15 at 2;[7] however, it does not separately analyze Plaintiff's state law negligence claim. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, *identifying each claim* or defense--or the part of each claim or defense--on which summary judgment is sought.") (emphasis supplied); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 n.2 (2d Cir. 1995) ("We . . . do not address the issue because it has not been argued in the instant matter.").

"In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Drake v. Village of Lima*, 530 F. Supp. 3d 285, 294 (W.D.N.Y. 2021) (internal quotation marks omitted) (quoting *Delaney v. Bank of Am.*

---

[6] In the court's May 9, 2022 Opinion and Order, it denied as moot Defendants' request to dismiss Plaintiff's negligence claim against the County of Erie to the extent it was based on *respondeat superior* liability or negligence under § 1983 because Plaintiff reported he does not allege such claims.

[7] "[Defendants] respectfully submit that there are no material facts in dispute that would prevent a finding of summary judgment in favor of [them] pursuant to F.R.C.P. §[ ]56."; *see also* Doc. 49 at 2 (stating as relief sought, "An Order and/or Judgment pursuant to, inter alia, Rule 56 of the Federal Rules of Civil Procedure, dismissing the Plaintiff's Complaint as against the Defendant, with prejudice, upon the grounds detailed within the accompanying declaration of counsel and memorandum of law; and, for such other further and different relief, not inconsistent herewith, as may be just, equitable and proper.").

19

*Corp.*, 766 F.3d 163, 170 (2d Cir. 2014)); *see Lundy v. Cath. Health Sys. of Long Island, Inc.*, 711 F.3d 106, 118 (2d Cir. 2013) (noting that the supplemental jurisdiction analysis will usually "point toward a declination[]" once federal claims have been dismissed) (citation omitted).

As the court has dismissed each of Plaintiff's federal claims, it declines to exercise supplemental jurisdiction over his negligence claims. *See Edmonds v. Seavey*, 379 F. App'x 62, 64 n.1 (2d Cir. 2010) ("As there existed no independent basis for subject matter jurisdiction over appellant's remaining state law claims, the district court was well within its discretion to decline to exercise supplemental jurisdiction over those claims.") (citing *Matican v. City of New York*, 524 F.3d 151, 154-55 (2d Cir. 2008)).

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment on Plaintiff's § 1983 and conspiracy claims asserted against all Defendants, as well as his punitive damage claim asserted against the County of Erie to the extent requested based on Plaintiff's federal constitutional claims. (Doc. 49.) It declines to exercise jurisdiction over Plaintiff's state law negligence claims and any related claims, and those claims are DISMISSED WITHOUT PREJUDICE to refile in state court.

SO ORDERED.

Dated this 28th day of August, 2024.

Christina Reiss, District Judge
United States District Court